Proceed whenever you're ready. May it please the Court. My name is Ralph Blumers. I represent Oregon Natural Resources Council, Klamasuskie Wildland Center, Humpka Watersheds and Headwaters. In this case, I also represented the plaintiffs in the District Court below. Klamasuskie Wildland Center was also the plaintiff in a recent case from this Court from May 5, 2004 called Klamasuskie Wildland Center v. the BLM, the case that is very instructive for this Court in deciding the issues before today. The Mr. Wilson Project suffers from the exact same legal problems that were at issue in Klamasuskie Wildland Center. Counsel, the 500-pound gorilla in this case is whether it's moot. Why isn't it moot? What could be done now to remedy the issues that were identified in your briefs? Yes. The Court in this case has precedent, Neighbors of Cutty Mountain, that discusses this issue in the context of claims under NEPA and NIFMA. In that case, the Court does not distinguish between the NEPA and NIFMA claims and finds that so long as effective relief can be granted. So the question is, what effective relief can be granted to address the issue? Under NEPA in this case, because this is strictly a NEPA case, correct? Yes, Your Honor. Okay. So what NEPA relief can be given now? The effective relief, in addition to the declaratory relief, could be injunctive relief requiring further road decommissioning, monitoring of the impacts. Further what? Road decommissioning, because this is a Tier 1 key watershed that was set aside. That's not a NEPA remedy. NEPA is just, you know, to make a report of what the consequences are. It's not to take corrective action under NEPA. NEPA doesn't require any kind of corrective action, right? It just requires, you know, an explanation of what the environmental impact is. That's correct. Well, what's the authority then to require, you know, road decommissioning under NEPA? Under the APA, as I read this Court's pressing, the Court has broad discretion to fashion equitable injunctive relief to address the violation of the law. Here we would have a procedural violation of NEPA for the failure to assess the cumulative effects of this project. Well, for a procedural violation, you want a substantive remedy, right? The Court has a power to issue injunctive relief, which is a substantive remedy, while the project activities are ongoing. And the Court also would have the power under the Neighbors of Cutty Mountain. It's discussed that the Court could issue injunctive relief as broad authority that's not limited by the APA to issue an injunctive relief to address the problems that flow from the NEPA violation, as plaintiffs identify in the reply brief at page 6. But Cutty Mountain, I think, you know, could be construed as relying really more on the National Forest Management Act for that kind of relief because, you know, there are substantive requirements under that act, right? That's correct. And there's no such claim here that NFMA has been violated. This is just strictly a NEPA case. This case did have other claims, but on appeal, the issue that's before this Court is whether… Nothing else is before us. Yes, that's correct. So the question is, what kind of remedy could we grant under NEPA? Under NEPA, the Court could order that the BLM should provide an accurate and reliable assessment of the cumulative effects of… What's the point of a reliable assessment after the fact when no action can be taken under that report? That's a good question, Your Honor. As the watershed analysis states, which the BLM is required to follow in any site-specific analysis, at a level of harvest exceeding 2 million board feet a year, this kind of level of harvest seriously jeopardizes watershed wildlife and other concerns. And this project alone is harvesting 6.4 million board feet. Combined with the bear pen project, and even if it were harvested over two years, it's harvesting 3.5 times the level that is considered to be unsustainable without seriously jeopardizing concerns for terrestrial species. So one of the remedies that the Court could issue would be an analysis of the impact, but then as a result of that requiring ongoing monitoring of the impact of this project on spotted owl activity centers. All of the logging in this project is within critical habitat for the northern spotted owl, all 213 acres. Would that sort of ongoing monitoring requirement have been an available remedy had the cutting not begun? In other words, if this case had been brought before any timber had been harvested, would the remedy that you're now describing have been available from the get-go? That is the kind of remedy that is appropriate in the context of trying to determine the impact on this particular species at issue and the wildlife that could be impacted. One other thing that I would like to mention. Is that a yes or a no answer? Yes, it would be a yes. The answer is yes. So you're saying that the remedy at the outset could have included a number of aspects, and some of them are still viable. Yes, Your Honor. And the other thing I'd like to note, while the timber harvesting has been concluded, the project is still ongoing. As stated by the BLM themselves in their decision record, which is at ER 34, they state, and I quote, The life of this action will extend through the time when stands are considered stocked and established. And in addition in that decision record, it talks about some limited road decommissioning based on the ongoing monitoring that would occur afterward. So it's plain as contention that the violation and the failure to consider the cumulative effects has not properly informed the BLM on what kind of post-harvest mitigation measures would address the cumulative effects in this project. So the post-harvest mitigation piece is still ongoing? Yes. And so you're saying that, at a minimum, the failure to have thought about it correctly at the beginning affects how the remainder of the project will be carried out? Yes, Your Honor. And that is why the relief the plaintiffs have identified in their briefing is effective relief. It can be granted by the district court. Now, the appellate court does not need to decide which relief is effective, and we don't have enough information in the Mr. Wilson EA to understand whether the finding of no significance is rational and that the mitigation measures that they put forth are sufficient, given the cumulative effects from this project. In this case, the BLM concludes that the project will not have significant cumulative effects, and the plaintiffs submit that a ruling by this court in plaintiffs' favor would be consistent with the 2004 Klamath-Siskiyou Wildland Center case decision, and it would provide much-needed direction for the BLM, an agency that has stubbornly refused to adhere to the rulings from this court. If this court, on the other hand, were to rule in favor of the BLM, the court would be providing the public and an agency with inconsistent direction on what the agency is required to disclose and consider. As identified in plaintiffs' brief, this logging takes place in the Tier 1 Key Watershed, just like the decision in Klamath-Siskiyou Wildland Center. It is on matrix land, but this Tier 1 Key Watershed is set aside for at-risk populations of salmon and steelhead. BLM admits that a total of 1,000 acres of old-growth logging would occur on the public lands, but doesn't identify how much logging would occur on the private lands. All of this logging is in critical habitat for the spotted owl. One example... How much work still remains to be done on this? The ongoing work that is after the harvest, Your Honor, is the planting, replanting of trees, road decommissioning. Because this is in a Tier 1 Key Watershed, there can be no net increase in road mileage. There's a lot of other mitigation measures post-harvest that are left undone. Well, the decommissioning of the road, I don't know about BLM, but the Forest Service, they go in and make the road unusable except for all-terrain vehicles, which trespassers use constantly. They go back in and use the roads anyway. But those aren't the people that are engaged in either the harvesting or the replanting. These are just the people who like to go out in the woods and look for animals to shoot and that sort of thing. If you got an injunction, what would it enjoin? As I was trying to explain to the Court, the equitable relief that could be fashioned by the district court would address the failure to assess the cumulative effects in that. It would give a better... It would go towards the mitigation measures that would actually address the cumulative environmental effects of this project. So you're saying that had the analysis been done correctly earlier, the mitigation measures might be different and more stringent than they are now. That's correct, Your Honor. That's exactly what I'm saying is without the analysis in the EA, this court is not in a position to assess whether those mitigation measures are appropriate and sufficient to address the significant environmental effects that might flow from this project. Plaintiffs have provided a number of concrete examples in the Mr. Wilson EA of what is missing. I just want to highlight, Dr. DePorte, on what the plaintiffs contend is missing in the environmental assessment. The resource management plan, the Medford RMP that is issued in this case, the same resource management plan that was at issue in Klamath-Siskiyou Wildland Center, the 2004 case, and that case requires site-specific consideration of the direction from the watershed analysis. The watershed analysis states that at a level of harvest of 2 million board feet, that concerns can be dealt with through the timing and location of timber sales. In the Mr. Wilson EA, the BLM uses its discretion to identify what other future projects exist. Mr. Wilson identifies Bear Penn, Key Elk, and Willie Slide as timber sales that will be occurring in the future over 1,000 acres. Now, these are projected sales that haven't been made yet. Some of them actually were logged concurrently with Mr. Wilson. Some were logged in the same time period. They've all been completed. Not all of them. One of them has not been completed as I understand it, and one of them is subject to other litigation. That's the Willie Slide project. Those projects together total 1,000 acres of logging, but just the Bear Penn and Mr. Wilson project alone are three and a half times what is considered sustainable. And, again, the WA states that the key is to provide the timing and the location of the timber sales, and that is key in this case because the Mr. Wilson project is logging within a Tier 1 key watershed that is a connectivity corridor between the Klamath Mountains and the Cascades, just like where the facts in the Klamath-Mississippi Wildlands Center 2004 date. If that logging is all completed, then what is it you want done in the future? A new study? Your Honor, given the direction from the WA that 2.0 million board feet is the top end of sustainable harvest in this entire watershed, and all told these projects, just two of them are 3.5 that, even if they're spread over two years, which is roughly the time in which Mr. Wilson was logged, that that is excessive and is seriously jeopardizing the continued functioning of this connectivity corridor and the habitat in these matrix lands. And so what plaintiffs are asking for is an accurate and reliable assessment of this logging in the context of the sustainable harvest levels and also a good look, a hard look, at the timing of these and the location vis-a-vis each other. In the Mr. Wilson EA, they identify these other projects, but they do not say how they might interact with each other to have a cumulatively significant environmental effect. And so what plaintiffs want is the analysis that was missing and an injunctive relief requiring mitigation measures to be considered and developed that would address those impacts. Was there any environmental assessment before the logging? This was a salvage logging operation, wasn't it? This is a green tree logging project involving primarily old-growth forests, 300-, 400-year-old forests in some case. Some of the last remaining trees that are of that age class within this watershed. This is a watershed that did not burn recently, but is heavily degraded from past private lands logging. And if you go to the watershed and make a field tour, you can easily find the remaining units before it was logged, and it was all green tree logging, Your Honor. Well, were these assessments made before the sale and the logging? The sum total of the assessment on cumulative effects, Your Honor, in the Mr. Wilson environmental assessment was the statement and identification of the other projects, Bearpen, Key Elk, and Willyslide, but they did not provide the separate acreages, what kind of habitat those projects were logging, where those were in relation to the Mr. Wilson project. They did identify that some of the direct effects from the Mr. Wilson project on the spotted owl habitat that he would be logging was all within a critical habitat unit for spotted owl, but they didn't look, like I said, to the synergistic potential effects of that. I'm just trying to visualize what, in answer to Judge Tashima's question about mootness, what remedial action would follow from any judgment we make? Well, this court, as Appellate Commissioner Shaw determined, just needs to determine that there is effective relief available to remedy the NEPA violation, and as Judge Tashima pointed out, NEPA is a procedural statute that requires adequate disclosure and consideration of the environmental effects, and as Judge Graber has identified, my argument is that without the proper identification of the environmental effects, we have no way of knowing whether the mitigation measures the BLM designed are sufficient to address what they failed to consider. So that is the sum total plaintiff's argument. If I could, I would like to preserve the balance of my time. You definitely may do that. Mr. Gray? May it please the Court, Michael Gray on behalf of the BLM. Of course, we believe that this case is moot, as all of the trees have been logged and removed from the project area, and the only activity that is left to be done in this project area is to hand pile and burn some of the slash created from that log. Well, is it correct that the project is at least theoretically not complete because there are remaining mitigation measures of some sort that are ongoing? My understanding is that the only thing left to complete in this project is to dispose of the slash, which is the limbs and such that's created when you log. So you're answering my question, yes, there is something still to be done. The project is not 100% completed. That's correct. That's what's left to be done. That will occur in the wintertime. I would point out that the plaintiffs in this case have never until today complained about, and even now they haven't complained about that specific activity. Well, as I understand their argument, it is this, that had a correct analysis been done in the first place, that even if logging had been allowed to this extent, there would have been required much more in the way of mitigation measures at the end of the logging beyond just burning the slash. And so their position, as I understand it, is by requiring the analysis now, it could still potentially result in more than slash burning, that is additional mitigation measures that would have to be undertaken before the project closes down. What's wrong with that as a theoretical mootness question, leaving aside whether their position actually has merit in substance, but what's wrong with that theoretically? In an APA case, in a NEPA case, the only relief that the court can afford is to set aside the agency action and join project activities until more action has been completed. Now, it may be that theoretically that could be a possibility, had they complained from the beginning about mitigation measures and said our complaint in this case is that even if you do all this logging, you haven't sufficiently studied mitigation measures. That's not what their complaint is. Okay, that's a preservation question. I want to separate out all these issues because you have several issues. One is mootness, one is preservation of the issue, and one is on the merits. But as a pure question of mootness, it sounds like you're agreeing that at least theoretically, had they complained and all of that and were they correct on the merits, that there could be something still to be done. If there were, well, no, I don't think I do agree, actually. Let me go back. Why not? Because what happens in these cases is an agency action is proposed, right? And then they go through and they study the agency action. And essentially what the plaintiffs are saying here is that we disagree with the agency action you've proposed, and you should have proposed something different. Well, that's not what NEPA's talking about. Now you're talking about the merits. Their complaint is that this was an inadequate hard look because it didn't consider the other related or allegedly related projects, which seems to be borne out by this court's Klamath Falls case, that substantive position. No, I'm trying to draw a distinction, I think, here between the mitigation measures. The project included certain mitigation measures from the beginning, correct? Correct, and they result from whatever analysis had been done, correct or incorrect. So a correct analysis might – well, different analyses result in different mitigation measures, right? They may or they may not. But they can. NEPA's a procedural statute, right? Correct. So you propose a project including the mitigation measures, and then you study that. Right. And regardless of what the NEPA analysis is, you can still go forward with the mitigation measures. Yes, you can, but presumably you're supposed to look at the things you're supposed to look at, even if you ultimately decide to do them. That's correct. And I would point out that mitigation measures are studied differently from cumulative impacts. Mitigation is something that occurs in the project area itself, right? Cumulative impacts is completely different. That's something that you look at on the watershed level, and so – Right, but wouldn't it make a difference, theoretically, that a mitigation measure might have to be more stringent if it has to mitigate problems in a small – in a larger area because the logging of this area has a bad effect not just here but elsewhere. It might theoretically alter the extent of mitigation that's required. I think theoretically that can be true. But, again, going back, you know, separating out the theoretical and the practical in this case, I think it's clear that what happened here is the plans came in. They've complained about portal-for-cedar root rot, which is no longer an issue. They've complained about the cumulative impacts analysis without really tying it to any particular harm that they say is going to occur. They don't say, for instance, that the owls will be harmed or anything else, and that we failed to discuss that. It's just sort of an abstract cumulative impacts analysis. And what they've never complained about until today, when the only thing they have left is this mitigation measure, is to say that, well, the BLM didn't study mitigation measures thoroughly. Well, if they're correct, and I know you don't agree that they are, but if they're correct on the merits, the other side of it is that the government has avoided doing what it has to do simply by moving forward. In other words, that by hurrying up, the proper requirements never have to be followed because they always end up being moved because you can go ahead and do the thing before it ever gets looked at. Well, I think what this Court said in the Headwaters case is that it's really not a concern in these types of cases because of the availability of injunctive relief. The plaintiffs can always move for preliminary injunctions, injunctions pending appeal. They could have moved for an injunction pending appeal, pending this appeal, and they've not done so in this court. They did in the district court, and that relief was denied. And so when we have an agency that has a lawful project, that it has an agency action on, and it's not enjoined, then there's nothing untoward at all about the agency proceeding with that project. And if injunctive relief is not obtained, then, and all of the trees are cut and the project is complete, then there's nothing left for this court to do. And that's the way litigation is played out. Let me ask Judge Graber's question. I get the same line of questioning, a little bit differently. Let's assume that this business about, well, the mitigation measures are inadequate, as discussed in the EIS, that that's properly raised by the plaintiffs that's before us. Now, if it is, then I guess the plaintiff's argument is, well, the case is not moot because the court can still require a new EIS to be drawn that addresses mitigation. Do you agree with that? I mean, that's, as Judge Graber says, a theoretical possibility, right? The court could not require, what the court could do is enjoin the project and say, we don't think- And send it back and say, do another report. And say, the court could say, do another report before you go forward with anything else in this project area. Right. So, doesn't that make this case a live case because some relief is theoretically available? I think that's a question Judge Graber's asking. I don't think it does for the practical reasons that I've talked about. In fact, in this case, mitigation measures have never been an issue. Well, no, I said assuming, you know, that the issue is properly before us. I'm hesitant to concede the point, Your Honor. Well, you're conflating mootness with the failure to raise an issue, and they're two completely different things. A case can be jurisdictionally alive, and a party waived a certain argument. I don't understand why you're putting those things together. Well, I think the one informs the other. I think you can't have a live case based on an argument that you've never brought. Let me put it this way. Suppose, I mean, the plaintiff can say now, well, BLM also violated the National Forest Management Act, right, today, to say that. And so, you know, on that basis, the court could issue an injunction saying you can't violate the National Forest Management Act, so that makes this a live case. And you would say, well, they never raised that below, and they're raising it here for the first time. That's the same argument you're making with respect to mitigation, isn't it? That's correct. That's exactly right. And I think it's a good way to look at this case also to think if these plaintiffs had come in today and filed a complaint, as the project said, and said, in fact, this project should be enjoined, the rest of it, because of all these bad effects that might come from it. I don't think a court, in the first instance, would hear that sort of complaint. And it's the same analysis now. There's really no effective relief that this court can afford. I mean, the other thing the plaintiffs have never grappled with is when can these cases ever be moved. Under their position, I think even, they would say, even if the project was completely done, the case wouldn't be moved because there may be some mitigation measures that you haven't considered. And so, effectively, they could come in any time and file a complaint after projects are done under their position and say, wait, you finished this project three years ago, but you didn't consider all of these cumulative impacts enough, and if you had, you might have done something different. Well, that's not the way that these NEPA cases and that litigation is supposed to work. And the same points apply with the same force in the mootness analysis now. There's really no effective relief that this court can give. It's not the court's responsibility to say, well, maybe there's more mitigation you could have done had you considered it from the beginning once the project is already over. Let me ask you, if the original environmental assessment was inadequate and there is still some additional timber that may be subject to sale and removal, why wouldn't there still be a need for a better environmental assessment if the other one was inadequate? Now, the district judge didn't reach that, I guess, because he decided the case was moot. But if there was a defective assessment and there's still some work to be done. Well, the district court actually didn't reach the mootness question for the very reason that we didn't raise it there because we hadn't completed the logging at that time. What the district court said was our analysis was okay. I think, to answer your question, if there is logging yet to be done, then under this court's case law, there would still be a live case. And if there's a possibility of more logging and more environmental harm. But here what we have, this case is really just like the Headwaters case, where you have a BLM sale in Oregon, where in Headwaters, actually, the sales were complete. The trees had been harvested, and only half of the trees had been removed from the area. So, in fact, this project is substantially more complete than the project in Headwaters. And in Headwaters, this court found that there was no effective relief because the trees were gone and they couldn't be ordered to be reinstated and dismiss that case as moot. And there's no difference between this case and the Headwaters case on that point. On the merits, we distinguish the Klamath-Escudu case that Judge Graber, you were talking about, on the basis that, in this case, all of the timber harvesting occurred on matrix lands and the substantial majority occurred on general forest management area lands. And those are lands that, through the Northwest Forest Plan, through the Medford District Resource Management Plan, EISs have been designated for timber harvesting. And what the EA cumulative impacts analysis, in this case, said, is that the riparian reserves, the late-secessional reserves, the marble murrelet reserves, and those areas will be sufficient, as contemplated by those earlier documents, to maintain these species' habitat concerns and that these areas that are set aside will not have a significant effect because species such as the owl will still be able to disperse to those areas that are set aside for their protection and these areas that are designated for timber management aren't. And so that's the way that we think that analysis is sufficient on the EA, and thus we're distinguishable from the Klamath-Escudu case. Unless there are more questions? I don't believe there are. Thank you for your argument. We have some rebuttal time remaining. First, I'd just like to address the issue of monitoring and whether that's been raised in plaintiffs' arguments. Plaintiffs have repeatedly raised concerns about the inadequate cumulative effects analysis. If you look in the cumulative effects analysis, and immediately after that, there is a discussion of monitoring on page ER 86, which is the page just after the sum total of their cumulative effects analysis, which is on ER 85, and it talks about monitoring ongoing two to three years after the project as being something that is going to occur with respect to the project's impact on terrestrial species. I don't think their argument is that there isn't an ongoing component. I think their argument rather seems to be that your complaint and your papers at the district court level and everything that preceded today did not take issue with the mitigation measures, did not take issue with the ongoing monitoring requirements and their adequacy. What is your response to that argument? My response, Your Honor, is that plaintiffs have repeatedly raised concerns about the cumulative effects analysis and the ongoing mitigation measures and monitoring flow directly from a rational and supportable and understandable cumulative effects analysis, one that the public and this court can understand. And in the briefing on the reply brief, plaintiffs have outlined a number of different types of effective relief that can be granted by the district court. That's not really an answer to my question. Do I understand your answer really to be we didn't specifically plead it, but it's necessarily encompassed by what we did plead? Is that a fair summary? My response, Your Honor, is that the plaintiffs pled for a broad relief and such other relief as may be just and proper. And I've litigated a number of these kinds of cases, and frequently in settlement situations, we go for the plaintiff's request mitigation measures in addition, changing the project design features. It is effective practical relief, and it is a component of our- For the problem that you identified. Yes, and we ask for such other relief as may be just and proper for that very specific reason, because it's unclear exactly when you're moving to litigation, when you have an inadequate EA, what effective mitigation is needed. And without the analysis, you don't know where these various projects are in relation to each other. In the Mr. Wilson project, they say they're focusing on small, isolated blocks. They do indicate that they're going to be logging the larger blocks of connectivity corridor, but they don't say how the cumulative effects of that will impact the functioning of this connectivity corridor. And without that, it's impossible for the plaintiffs to come up with exactly what kinds of mitigation measures would be appropriate and pick those apart. That's usually after you have the proper analysis. And I would just point the court again to our reply brief at 5 and 6, where we go through both what kinds of relief would be effective for curing the NEPA and what flows from that in our footnotes. One of the other things I would like to say is with respect to the project activities that the BLM admits is still ongoing, broadcast burning, the plaintiffs have complained that the broadcast burning that they did do for a couple of the units ended up killing the few leaf trees that were left in those units. Some of this logging is basically a virtual clear-cut, leaving about six trees an acre, and then afterwards they burn those units. And as part of that broadcast burning, as we have in footnote 1, a lot of some of those other leaf trees were killed. So one of the effective relief that is practical and has a significant impact on the ground is that plaintiffs would request that future post-slash-cleanup be done in a different method to preserve the few remaining green trees that were not harvested in this project. I just want to point out in my last 20 seconds that the Klamasiski Wildland Center case is in matrix also, the 2004 opinion. It's no different. It involves the same Medford RMP. And the last thing I would like to point out is for this court to look at the district court opinion from Epic v. Blackwell, which is 389 F-1174. That case was also in matrix land. And just because it's in matrix land does not mean the BLM can log with impunity and not do the required cumulative effects analysis. Thank you. Thank you, counsel. The case just argued is submitted. We appreciate the knowledgeable arguments from both sides. Our final case.
judges: Goodwin, Tashima, Graber